Our original decree is corrected so as to allow legal interest on the item of $477 from July 14, 1933, until paid; and both applications for a rehearing are refused.

| 55 So. 44 |

**RUSSELL v. SIMMONS & SIMMONS et al.**

No. 32541.

May 21, 1934.

Jewell Z. Spearing and George P. Eberle, both of New Orleans, for appellant.

Caleb C. Weber, of Donaldsonville, and Guion & Upton, of New Orleans, for appellees.

BRUNOT, Justice.

This is a suit for the return of $8,134.43, the sum of an alleged overcharge for professional services which the defendants, under their contract of employment, were not entitled to retain out of certain collections made by them for the plaintiff's account.

The plaintiff is a sugar dealer and broker. He was the holder and owner, in due course, of six promissory notes, for $10,000 each, made and issued by Alleman Planting & Manufacturing Company, Limited, and secured by a special mortgage, importing a confession of judgment, upon the following property, owned by the Alleman Planting & Manufacturing Company, Limited, and situated in Assumption parish, La., to wit: Six acres of land with the sugar house thereon, a line of railroad, locomotives, cars, mules, and other property. None of said notes were paid at their

maturity. Before any action was taken to enforce their payment, the sugarhouse, which was insured for $60,000, was destroyed by fire.

It is admitted that the contract of employment by which the professional services of the defendant firm were secured was a verbal agreement, entered into by the plaintiff and Mr. Ansil N. Simmons, the senior member of the defendant firm, in the private office of the plaintiff in New Orleans. It is also admitted that Mr. Ansil N. Simmons associated Mr. C. C. Weber with his firm in the conduct of the judicial proceedings which followed. For that reason Mr. Weber was cited as a defendant in this suit. Being a nonresident of the judicial district in which the suit was filed, Mr. Weber excepted to the jurisdiction of the court. This exception was maintained and the suit, as to Mr. Weber, was dismissed. This ruling is not complained of; hence it is final.

There are two seriously disputed facts in the case. First, whether or not the contract of employment was entered into before or after the sugarhouse was destroyed by fire. Second, the agreed percentage of the sums collected by the defendants which they were entitled to retain as compensation for their services.

The suit is based upon the plaintiff's version of the contract, and his contention that the contract was entered into after the sugarhouse was destroyed by fire. The defense to the suit is based upon Mr. Ansil N. Simmons' version of the contract, and his contention that the contract was entered into several days before the sugarhouse was burned. The defendants further contend that the plaintiff's suit is upon a contract; hence the burden is upon him to prove the contract, and, as the trial judge resolved the facts in favor of the defendant, the judgment appealed from should be affirmed.

With respect to the two seriously disputed facts mentioned, supra, the plaintiff alleges in his petition, and testifies, that the contract was entered into on August 15, 1926, about seven days after the sugarhouse was destroyed by fire; that the agreement included necessary proceedings and recovery upon the insurance policies, and the compensation to be paid the defendants for their services was 5 per cent. of the sum of the insurance collected and 25 per cent. of the sum realized by the defendants' sale of the remnants of the burned sugarhouse and other mortgaged property.

With reference to the tenor of the agreement and the time it was entered into, the plaintiff's testimony is corroborated by that of Mr. Tom Brown, who was present and heard the agreement.

The defendants allege, and Mr. Ansil N. Simmons testifies, that the contract of employment was entered into on August 6, 1926, two days before the sugarhouse burned; that his firm was employed to represent the plaintiff in foreclosure proceedings; in suits affecting the plaintiff's mortgage rights; and, in the final disposition of the mortgaged property on a contingent fee basis of 25 per cent. of whatever amounts might be realized from the disposal of said property by sale or otherwise.

It is admitted that the insurers of the sugarhouse deposited in the registry of the

court $55,620, which sum was finally adjudged to be the property of the plaintiff. It is also admitted that, by an agreement of record, certain deductions were made from that sum and that the defendants retained, as their fee, 25 per cent. of the remainder, or $11,006.62.

On the two disputed points mentioned, supra, we think it advisable to quote the testimony as it was given by the plaintiff and Mr. Brown, and by Mr. A. N. Simmons. The plaintiff transcript pp. 27, 28, says:

"Several days after the fire, Mr. Simmons came to my office in New Orleans and we talked matters over. I agreed to place these notes in his hands for collection. I would have saved money if we would have compromised and I had given him (Alleman) one note of $10,000.00. Mr. Simmons didn't think well of it, and I retained Mr. Simmons with the understanding that he could handle the collection of the notes for 5% but on account of the different trouble in handling the remnants, I would give him 25%. That is the only agreement we made.

"Q. That 25% applied to the handling of the remnants alone?

"A. Yes, sir.

"Q. Prior to the fire that is said to have occurred on the nite of August 8 or 9 of 1926, did you turn over any documents to Mr. Simmons?

"A. About a week or ten days after the fire I turned over the notes with Mr. Weber there.

"Q. Prior to the fire did you have an interview with Mr. Simmons?

"A. Yes. Mr. Simmons came down to New Orleans before the fire, it might have been 3 or 4 days before. He first told me that Alleman was going to give me trouble. He advised me that I had better take some action. I couldn't do it very well. If I did put it in the hands of some bank or firm for foreclosure, I'd be on the outs with Alleman and couldn't get them to run the place. For that reason I thought it best to wait."

The cross-examination of the witness appears in the transcript at pages 30 to 35, both inclusive. We quote therefrom the following:

"Q. Mr. Russell where were you and where was Mr. Simmons when you delivered those mortgage notes to him?

"A. In my office at the corner of N. Peters and Bienville Sts.

"Q. Who was with you?

"A. Caleb C. Weber. I believe it was the first time that Mr. Weber was ever there.

"Q. You knew Mr. Simmons had associated him?

"A. Mr. Simmons told me he had a good man with him, but he didn't say who it was.

"Q. For what purpose?

"A. To recover this money from the insurance people.

"Q. I am interested in knowing, prior to the fire what was your discussions with Mr. Simmons, if any?

"A. Mr. Simmons came to my office and said that Alleman was going to give me trouble. I'd better do something in regard to the foreclosure on that property. I couldn't

do it at the time because I was negotiating with Penick & Ford.

"Q. Was that discussion prior to the fire?

"A. Yes, I told him I would let him know. In the meantime the fire took place.

"Q. When did you employ him for the foreclosure?

"A. I didn't know it was necessary; I employed him to collect those six notes.

"Q. When did you do that?

"A. About 4 days to two weeks after the fire; the notes were turned over to him about 10 or 15 days after.

"Q. Was any one present when you made this agreement with Mr. Simmons?

"A. Mr. Tom Brown.

"Q. Is he in court?

"A. Yes, sir."

From the testimony of Mr. Tom Brown (transcript pp. 42, 43) we quote the following:

"Q. Mr. Brown, do you recognize Mr. Simmons?

"A. Yes, sir.

"Q. Were you ever present when Mr. Russell and Mr. Simmons were present discussing legal matters, especially in regard to fees?

"A. That's the only thing he discussed when I was there on each occasion.

"Q. State to the court what occurred?

"A. The first several times it was in connection with the Alleman Planting & Mfg. Co. The last time I saw Mr. Simmons there, it was in the month of August, about a week after the fire.

"Q. What did you hear?

"A. I heard the discussion of 5% on the collection of notes and 25% on the remains of the sugar house.

"Q. What agreement did they reach?

"A. Mr. Simmons was to get five per cent for the collection of the notes and twenty five per cent. of the wreckage of the sugar house.

"Q. What do you mean by twenty-five per cent. of the wreckage of the sugar house?

"A. Twenty-five per cent. of whatever he sold it for.

"Q. What did you understand by five per cent. of the notes?

"A. Well, if he collected the full amount he would get five per cent. and if he got half of the amount, he would get five per cent. Whatever amount of money he got he would get five per cent.

"Q. That is what Mr. Russell testified?

"A. Yes.

"Q. The notes were sixty thousand dollars?

"A. That's what I understood."

The testimony of Mr. A. N. Simmons is in direct conflict with that of the plaintiff and Mr. Brown as to the tenor of the agreement and the time it was entered into. We quote from his testimony (transcript pp. 24, 25, 26) the following excerpts:

"Q. When were you retained by Mr. Russell for the purpose of collecting all of these notes?

"A. About, I believe it was August 6, 1926, in response to a letter received by me from Mr. Russell. I called at his office in the city

of New Orleans and he told me that he wanted me to handle the Alleman Planting company's indebtedness and try and dispose of the sugar house that his mortgage bore against. I told him the first thing he would have to do was to foreclose his mortgage and get possession of the property, as it was then owned by the Alleman Planting Company and he couldn't sell it or dispose of it until he became the owner of it. At that time he advised me that he didn't have any money to pay lawyer's fees, but that if I'd handle it he would give me twenty-five per cent. of whatever amount we received from the sale of the sugar house and the six acres of land.

"Q. Have you a copy of the letter of Mr. Russell to you that you have mentioned?

"A. I have not been able to locate it, but I don't believe Mr. Russell would deny it. It was sent to me. Going on with my answer to the first question: I told Mr. Russell I would handle the whole thing for him for the twenty-five per cent. of whatever I might recover or receive from the sale of the sugar house, the railroad and the six acres of land. All this was on a contingent basis. Mr. Russell didn't want to put out any money, he said he had no money to pay lawyer's fees, and said I could get this amount if we could dispose of the sugar house on which his mortgage rested. When we were discussing the handling of this business I advised Mr. Russell that I was going to associate Mr. Caleb C. Weber of Donaldsonville, with me in this business. * * *

"At the time the agreement to handle this business was made the sugar house was in-

tact, but when the foreclosure was filed the sugar house had burned, and we foreclosed on the six acres of land and the remnants of the sugar house, as a foundation to enable us to make a claim to get the insurance money."

With respect to the letter Mr. Simmons mentions in his testimony but says he was unable to produce, the plaintiff testified as follows:

"Q. Did you ever write a letter to Mr. Simmons requesting him to call on you in reference to that matter?

"A. Not in regard to that. We had lots of correspondence but not in regard to that. Mr. Simmons came to me and said he was hard up and he needed money and said he'd like to get the business. One of the reasons I couldn't give it to him was because Mr. Burt Henry is my lawyer; I couldn't employ him until I saw Mr. Henry. Mr. Henry didn't care to have anything to do with it on account of his associations with Mr. Alleman. Mr. Simmons sat down at my desk; I had on there a blotter; first he said I'd like to get that job and he put down on the blotter, in ink 5%. Then he put down the figure $15,000 on the blotter. He said, 'I'll tell you what I'll do; I'll do it for $750.00.' He put that down in ink on the blotter. I couldn't tell him yes or no; I told him I'd let him know later on, on account of my negotiations with Penick & Ford."

The defendants offered several witnesses for the purpose of showing that Mr. A. N. Simmons was engaged in securing oil leases in Iberville and adjoining parishes at the time the plaintiff and Tom Brown testified that the agreement between the plaintiff and

defendant was reached, but none of these witnesses saw or knew where Mr. Simmons was on or near that date. Defendants offered a letter written by Mr. Simmons to Mr. Weber, of date August 7, 1926, from which we quote the following:

"Russell had written to me to call when in the City and while there yesterday I called upon him and discussed the foreclosure of the mortgages on the sugar house and six acres of land, railroad lines, locomotives and in fact everything that goes with the sugar house.

"They have no money to pay fees and I have accepted a proposition to give me 25% interest in the property for the work and I feel that we can sell the sugar house, land, two or three buildings, cane cars and locomotives, etc., for at least $25,000.00, and if we can get that it will give us a much better fee than we could hope to get in the event we were paid in cash."

If the sugarhouse had not burned, the above letter would have called for serious consideration as corroboration of defendant's testimony, but when the principal asset of the mortgagor was destroyed by fire, the status of the property and the rights of the mortgagee were so completely changed as to call for a new contract for the enforcement of the mortgagee's rights against the insurer.

Having reached this conclusion, and finding that the defendants, after a prolonged litigation, succeeded in realizing for the plaintiff the sum deposited by the insurer in the registry of the court, defendants are certainly entitled to a fee for their services based upon a quantum meruit. We are of the opinion that this view of the case obviates any necessity of endeavoring to reconcile the conflicts in the testimony which we have quoted, supra. Inasmuch as there is no testimony in the record as to the value of the services rendered by the defendants, this case will have to be remanded for the admission of testimony to establish that fact.

For the foregoing reasons, it is decreed that the judgment appealed from is avoided and reversed, and this case is remanded to the trial court to be proceeded with according to law and the views herein expressed; the costs of the appeal to be paid by appellees.